UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br> (RBW/ak) <br><br> NATIONAL POSTAL MAIL HANDLERS UNION, A DIVISION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, <br><br> and <br><br> UNITED STATES POSTAL SERVICE, <br><br> Defendants. | Case No. 1:05-CV-01290 |

# Exhibit 3 to Hill Declaration

|                                                                                                                                                                                                                |   |                       |
|---|---|---|
| In the matter of the Association between                                                                                                                                                                       | : |                       |
|                                                                                                                                                                                                                | : | Case No. AD-NAT-1311  |
| AMERICAN POSTAL WORKERS UNION, AFL-CIO                                                                                                                                                                         | : |                       |
|                                                                                                                                                                                                                | : |                       |
| and                                                                                                                                                                                                            | : |                       |
|                                                                                                                                                                                                                | : | OPINION AND AWARD     |
| NATIONAL POST OFFICE, MAIL HANDLERS, WATCHMEN, MESSENGERS, AND GROUP LEADERS DIVISION OF THE LABORERS INTERNATIONAL UNION OF NORTH AMERICA, AFL-CIO                                                            | : |                       |

## **BACKGROUND:**

Even prior to the issuance of Regional Instruction No. 399, MAIL PROCESSING WORK ASSIGNMENT GUIDELINES, by the USPS, and its subsequent revisions and amendments, the APWU voiced its dissatisfaction with the decisions made by the USPS in regard to the primary craft assignments relative to the performance of specific mail processing work functions. This long-running dispute came to a head after all efforts to effect a compromise between the competing contentions of the APWU, the Mail Handlers and the Postal Service had not resulted in an agreement, and the USPS published Regional Instruction No. 399, and set about making new work assignments.

A definitive statement of the APWU protest was contained in a letter dated September 28, 1979 from General President *** Andrews of the APWU to Assistant Postmaster General James Gildea.

Several days, in this lengthy hearing, were spent in arguing the arbitrability of the contentions raised by the APWU. After much discussion, on and off the record, the parties agreed to enter into a stipulation to resolve that issue. The stipulation provided: (1) that the USPS and the Mail Handlers would withdraw their objection to the arbitrability of the issue presented by the APWU, (2) that the APWU would not challenge the legality of the issuance of Regional Instruction No. 399, (3) that the parties would meet and agree on what particular assignments were contested by the APWU and which were to be resolved in this arbitration proceeding, and (4) the USPS and the Mail Handlers would not object to the APWU seeking a retroactive, remedy if the Arbitrator were to sustain its contention that the USPS had violated the National Agreement in making these assignments.

When this stipulation was accepted, the APWU agreed that only those assignments contained in Regional Instruction No. 399 at issue were those listed in President Andrews' September 28, 1979 to APG Gildea.

That letter set forth the following assignments to which the APWU took exception:

    1.  "Operation 010- We dispute the award of any portion of this operation to the mail handlers craft as the primary craft with the exception of letter cancellation on facer-cancellers.

    2.  "Operation 020-This union disputes the assignment of any portion of this operation to the mail handler craft as the primary craft.

    3.  " Operation 050/055-We dispute the assignment of any work in

the primary mail function to mail handlers as the primary craft.

4. "100-We dispute the award of the distribution of all parcel post without scheme knowledge to the mail handlers.

5. "Operation 105- We dispute the assignment of dispatching in Item No. 5 to the Mailhandler craft. We also challenge to award of inserting labels to the mail handler craft.

6. "Operation 109- We dispute the readdressing of parcels and record keeping other than an actual of the mail handler *** the insertion of the note at the bottom of Operation 109 as we claim all distribution work.

7. "Operation 168/169- We dispute the assignment of mail handlers to the box section in any post office.

8. "Operation 180/189- We dispute the assignment of labeling of sacks and the dispatching of pouches to the mail handler craft.

9. "Operation 200- We dispute the assignment of labeling of sacks and the dispatching of pouches to the mail handler craft.

10. "210/239- We dispute the assignment of manual sorting of outside parcels as a primary function of the mail handler craft, even though such distribution is non-scheme.

11. "We challenge the award of loading of ledges and sweeping cases as a primary function of the mail handler craft wherever such an award is made throughout the several pages of Regional Instruction No. 399.

12. "In the Bulk Mail Canters we dispute the award of the missent/malfunction chutes as a primary function of the mail handler craft.

"We also dispute the assignment of non-machineable outside parcel sortation to the mail handler craft as a primary function."

The APWU contended, on the basis of the criteria established in the USPS-Mail Handler-APWU-NALC Memorandum of Understanding on Jurisdictional Disputes, which is set out on pages 142-143 of the July 21, 1978 National Agreement, the USPS should have assigned the clerk craft as the primary craft for all of these operations, except for 010 and 020, which should have been jointly assigned to the mail handlers and the clerks.

The criteria enumerated in that Memorandum are:

1. existing work assignment practices;
2. manpower costs;
3. avoidance of duplication of effort and "make work" assignments;
4. effective utilization of manpower, including the Postal Service's need to assign employees across craft lines on a temporary basis;
5. the integral nature of all duties which comprise a normal duty assignment;

      6. the contractual and legal obligations and requirements of the parties.

The APWU also pointed out that the Memorandum provided as well that other relevant factors could be considered by the committee to decide jurisdictional disputes or, in turn, by the arbitrator if no resolution of a dispute were achieved by the committee and the matter proceeded to be arbitrated under Article XV. The APWU urged that the criteria considered by the NLRS in section 10 (k) proceedings also be weighed. The APWU also urged that "community of interest" be considered as another criteria as it had been by other arbitrators in postal service jurisdictional disputes which went to arbitration prior to the agreement being reached to establish the jurisdictional disputes committee. The APWU also made reference to an arbitration decision issued by National Arbitrator Garrett in 1974 wherein various relevant criteria were discussed in a successful effort of the APWU to resist a challenge by the Mail Handlers to an ultimate decision of the USPS to uphold the assignment of three disputed positions in Oakland, San Francisco and Seattle to the clerk craft.

The Mail "Handlers agreed that the criteria listed in the Memorandum of Understanding, among other relevant factors, could be employed to determine whether the assignments made in Regional Instruction No. 399 required a reassignment of the disputed operations to the APWU. The Mail Handlers also argued that the APWU waived its right to dispute those assignments in Regional Instruction No. 399 by refusing to negotiate about such assignments during the 1978 national negotiations.

The Postal Service took the position that, in the light of the rights which it reserved in Article III of the National Agreement, it was entitled to designate the Mail Handlers as the primary craft, where applicable, for the assignments challenged by the Clerks in this proceeding. The Postal Service alleged that the determination as to primary craft assignments finally made in Regional Instruction No. 399 sought to achieve an efficient and cost effective way to resolve the jurisdictional "morass" between these unions while at the same time creating the least amount of confusion in the field. By weighing the skill level involved in these tasks under review, productivity, past practice, and the need for efficiency and economy, and after consultation with the union officials from the competing crafts, the USPS team came up with a determination as to which craft would be considered primary in making assignments and, where necessary, where the other craft could be assigned as a supplemental or secondary craft.

Such proposals as the postal officials presented were discussed intensively with union representatives from the competing crafts at first in joint meetings and later in separate sessions during 1977 and right up to and during the 1978 negotiations. Specific proposals were made for post office operations as well as those conducted at the Bulk Mail Centers. When these negotiations ended without an agreement, the Postal Service undertook to issue its own jurisdictional guidelines incorporating to some extent the positions adopted by the APWU as well as the Mail Handlers as a compromise. After receiving comments from the field, the USPS issued revised guidelines which were submitted to the unions for comment. Weighing these comments from its own operating officials as well as the reaction from the APWU and the Mail Handlers, the USPS took the bit in its teeth and issued Regional Instruction No. 399 on February 26, 1979. This formulation of primary and secondary assignments brought forth the protest in General President Andrews' letter of September 28, 1979 discussed above.

## OPINION OF THE ARBITRATOR:

It is necessary preliminarily to address the argument raised by the Mail Handlers that the APWU had waived its right to arbitrate the merits of its case contesting the assignments made in Regional Instruction No. 399 because the APWU indicated that it had an agreement with the Postal Service and refused to participate in subsequent negotiations with the USPS and the Mail Handlers on these disputed work assignments after the remainder of the 1978 collective bargaining agreement had been agreed upon.

The evidence in this record did support the Mail Handlers claim that it did continue to negotiate on jurisdictional matters after the wage agreement had been made and after the APWU left the main bargaining table. After further negotiations, the spokesman for the Mail Handlers and for the Post Office did

sign a joint statement which reads as follows:

> "The parties hereto agree that within sixty (60) days of July 21, ***, the Employer shall issue for prompt national implementation a detailed statement setting forth those work assignments which are within the exclusive jurisdiction of the Mail Handlers Craft. Disputes arising out of the issuance of such a statement shall be subject to the dispute resolution provisions contained in the Memorandum of Understanding on Jurisdiction agreed to by the unions party to the National Agreement.
>
> Disputes between the parties hereto with respect to implementation of the aforementioned statement shall be subject to the provisions of Article XV of the National Agreement."

A reading of this agreement between the Mail Handlers and the USPS will reveal that these parties did provide and recognize the continued existence of the Memorandum of Understanding on Jurisdiction which was also contained in the new National Agreement.
Under the terms of that Memorandum, the APWU could still contest any assignments of jurisdiction made by the USPS regardless of the agreement of the Mail Handlers to the terms of the assignment. That Memorandum also provides that where the machinery established in the National Agreement does not resolve jurisdictional disputes the aggrieved party may employ the arbitration procedure found in Article XV. A waiver of the right to employ the disputes resolution machinery so provided cannot be found in the agreement which was reached by only two of the parties upon whom such jurisdictional assignments might have an impact.

Additionally, the record made in the early days of this proceeding, will clearly establish that the Mail Handlers did stipulate and agree that the issues raised by the September 28, 1979 letter of President *** Andrews would be addressed on the merits by the Arbitrator.

In weighing the merits of the contentions raised by the APWU, the Arbitrator was guided principally by the criteria established in the Memorandum of Understanding, which are set forth above, as well as by the other considerations voiced by the arbitrators who decided earlier jurisdictional disputes between these same parties. Furthermore, the changes which have taken place in mail processing in the postal service in the relatively recent past also had to be taken into consideration in order to realistically appraise the compliance by the Postal Service with the criteria mentioned above in its determinations made in publishing and implementing Regional Instruction No. 399 in the manner protested by the APWU.

There is no question that with the passage of the Postal Reorganization Act, as the USPS pointed out, Congress decreed that greater emphasis on efficiency and economy would have to be exhibited by management. To that end, management was charged by the Congress with the responsibility for reviewing all postal service operations to promote greater efficiency and more expeditious mail handling.

At the same time, perhaps spurred on by postal reorganization legislation, there have been dramatic and far reaching changes adopted in the actual mail distribution process. Even more apparent than the disappearance of reliance upon rail transportation has been the impact of the adoption of the zip code on the need to employ scheme knowledge in the same manner as had previously been required. In addition to a deemphasis in the reliance upon scheme knowledge, technological changes and innovations, having widespread effect upon the operations now required to process the mail, as contrasted to the earlier techniques and systems which were employed, are now in operation. Greater reliance upon bulk mail handling and mechanization along with the adoption of the Bulk Mail Center system and the use of the letter sorting machine are just some examples of the revolutionary changes which have taken place.

Although distinctions between clerk duties and those traditionally assigned to the mail handler are still

apparent in many of the mail processing operations, the impact of the legislation which required that management reconsider its way of delivering mail as well as revamp the methods and means employed to do so has blurred those distinctions in several areas of mail handling.

All of the considerations referred to above have impacted upon the present day skill requirements and responsibilities of the individual crafts. The Arbitrator must determine whether President Andrews' grievance is positioned upon a correct contention that the assignments in Regional Instruction No. 399, which are the basis of his protest, violate any Postal Service obligation imposed in the 1978 National Agreement, and whether the Postal Service obeyed any restrictions upon making such primary craft assignments as they may be imposed by the terms of the Agreement.

Some further words, by way of background, may be in order. Disputes between the APWU and the Mail Handlers over the proper craft assignment of certain positions in mail processing have been ongoing for many years, even prior to the establishment of the reorganized Service in 1970. In the bargaining which took place leading up to the making of the 1975 agreement, this jurisdictional rivalry almost caused negotiations to collapse. This event led to the establishment of the Jurisdictional Committee pursuant to the Memorandum of Understanding.

After the 1975 Agreement was then consummated, the Unions met with the Postal Service in an attempt to resolve jurisdictional issues. It was apparent that the primary cause of friction was the overlapping claims of the Clerks and the Mail Handlers. A special subcommittee was then formed on which representatives of the Clerks, the Mail Handlers and the Postal Service served. Many meetings of this subcommittee were held but the parties did not make much progress. In January of 1977, at the request of these unions, the Service assembled a team to develop a proposal on resolving the conflicting jurisdictional claims. This team was to be guided by the six criteria mentioned in the Memorandum of Understanding, past practice, certain previous arbitration decisions dealing with conflicting jurisdictional claims, and also were directed to keep in mind the USPS' desire to achieve greater efficiency and economy of operations. The team also was to consult various handbooks issued by the Service containing bargaining unit position descriptions, personnel practices, and the qualification standards for all Postal Service positions.

The overall goal of their efforts, as they described it, was to develop an efficient and cost effective way to resolve the jurisdictional claims while creating the least amount of confusion in the field.

As part of their study, this team broke down the mail processing operations in the post offices into their component functions. Then, weighing the skill level involved, productivity, past practice, and the need for efficiency and economy, the team recommended that either the Clerks or the Mail Handlers be assigned as the primary craft to each respective function in each operation. The team deliberately designated one or the other craft as the "primary craft" so management would have some flexibility in making assignments.

The initial proposal, which did not cover assignments at bulk mail centers, was then presented separately to each of the Unions for comments and criticism. This was in November of 1977. Each Union had some reservations about some of the original primary craft assignments made by the Postal Service, but the testimony in this proceeding did not indicate that the methodology employed by the Postal Service team had been attacked. After meetings with these Unions, the Service compromised in some areas as did the Unions. In April of 1978, the Service presented the Unions with a new document which incorporated many of the proposals and dispute between these Unions, not directly associated with the Postal Service's proposed assignments, they would not agree to accept the Service's proposal.

Negotiations for the 1978-1981 National Agreement then got underway. During the course of these negotiations, using another team of management officials who were experienced in bulk mail center operations, another package of craft assignments covering bulk mail center operations was developed.

In those negotiations, another subcommittee was established to work with a Federal Mediator in an attempt to resolve the ongoing jurisdictional issue. Both Unions proposed changes in the previous presentation

made by the Postal Service. Those efforts did not result in an agreement to which they could all subscribe, and the jurisdictional issue went back to the main table.

It was at this point, as discussed earlier, that the Mail Handler President insisted that the jurisdictional issue be resolved. The Clerks' President claimed that all the issues to be addressed at the main table had been resolved and that he had an agreement. He left the negotiations.

After further discussion with the Mail Handlers and also after adopting many of the changes also demanded by the APWU in earlier negotiations, the Postal Service issued a revised copy of its proposed guidelines to both Unions and to its field management officials for comment. This was in August of 1978. A further revision was distributed in November of 1978 and the guidelines were published as a Regional Instruction on February 16, 1979. Thereafter, the APWU raised certain objections to several of the provisions of the Instructions. Three additional meetings with the APWU were held and further changes in the Instructions were made to meet those objections. An amended version of Regional Instruction No. 399 was eventually issued on June 15, 1979, and an errata sheet to supplement it was published on July 6, 1979.

Each of the thirteen objections to that document set out in President Andrews' letter of September 18, 1979 were reviewed by the Arbitrator against the guidelines agreed to by the parties to this dispute in the Memorandum of Understanding. Found in the 1975 and 1979 Agreements. The Arbitrator also adopted the suggestion of the APWU and considered the guidelines customarily employed by the National Labor Relations Board in 10 (k) cases, as well as a wide variety of factors including past practice, skills involved, and qualifications necessary to perform the work as it presently is performed. None of these factors was given predominant weight although the APWU urged in many instances that traditional practice based upon the earlier requirement of scheme knowledge should be afforded such weight. If the Arbitrator were to do so, he would have to ignore the obvious extraordinary changes in mail processing operations to which reference was made earlier.

Much of the testimony was concerned with the APWU claim that all of the work involved, with one exception, in either Operation 010 or 020, should be awarded to Clerks rather than Mail Handlers, as provided in the Regional Instruction, or in certain instances there should be an award of jurisdiction to both crafts jointly. The testimony in this record, even that offered by APWU witnesses, confirmed that 010 and 020 operations are traditionally basic mail handler craft work. That is not to say that in some offices, during peak hours, management has not assigned other crafts to this type of work. However, such supplemental use of other crafts does not establish the preeminence of the clerk craft assertion of jurisdiction. The fact that certain APWU studies indicated joint manning of these operations at certain facilities does not alter the present dictate of Regional Instruction 399, which would not require that practice be disturbed. If the evidence as to manpower costs, employee required skills or qualifications, and the avoidance of duplication of effort as well as the integration of duty assignments are also considered, the testimony fully justifies the assignments of the functions in the 010 and 020 operations as they are set out in Regional Instruction No. 399.

As to Operations 050/055, at the hearing, the APWU objection was modified to only encompass post offices where the primary mail is so reduced so that allied functions ought to be part of the distribution process which the Regional Instruction give to clerks.
If one reads the footnote found on the bottom of page 3 of the Regional Instruction, it appears that such integration of the operation and such an assignment is contemplated under the circumstances to which the APWU made reference. Management is mandated to make such integrated assignments in the interest of efficiency and economy and under the authority granted to it in Article III of the National Agreement.

Regarding Operation 100, the Clerks alleged that since this operation involved single piece distribution it should by tradition and practice be assigned to Clerks. This is non-scheme parcel post handling. The Mail Handler key position description specifically reads "simple distribution of parcel post." Such non-scheme distribution must be equated with the term "simple distribution." In the past, it is true, much of the parcel

post operation was worked by Clerks. Without scheme knowledge presently being required, the rational for making this a primary clerk assignment no longer exists. The testimony in this record on such work assignment practices across the Country now shows a mixed practice at best and not one which would support the Clerk's claim to primary assignment based on any present national practice.

Operations 105, 180/189, and 200: Labeling and Dispatching: All these operations involve the same functions of labeling and dispatching sacks and pouches of mail. The APWU witness appeared to argue that since a Clerk was responsible for distribution, permitting a Mail Handler to insert a label on a sack could cause that sack to be misrouted and the Clerk could be charged with and held responsible for such an error. These labels come from a label holder containing many pre-printed labels. All the Mail Handler is required to do is to physically insert such a pre-printed label into the proper place on the sack or pouch. Although Mail Handlers obviously have the necessary skill to perform this function, "Regional Instruction N. 399 does provide that when labeling and dispatching are an integral part of the distribution function, they will be performed by Clerks. For this reason, it must be found that the Regional Instruction in a realistic and most efficient manner provides for the primary assignment to be determined by considering the efficiencies of an integrated operation. The evidence of national practice as to the assignment of this function discloses that both Mail Handlers and Clerks have been assigned primary jurisdiction at different facilities for these operations.

As for Operation 109 (Parcel Rewrap), Operation 168/169 (Box Section) and Missent Malfunction Chutes, the testimony in this record, which can be afforded evidentiary weight, indicates that rewrap operations do not require skills beyond those possessed by the Mail Handlers and certainly do not require scheme knowledge. Other testimony supports the claim of the Mail Handlers that rewrap operations at some facilities in the field have always been performed by members of that craft. It cannot be found, based upon the record made by the APWU, that there has been a failure to abide by relevant criteria in the manner in which these operations have been assigned. With regard to Operation 168/169 (Box Section), once again, Regional Instruction No. 399 would permit the assignment of these operations to the Clerk craft in the event that it appears to be integrated with the distribution function. As for missent/malfunction chutes, such testimony as is to be found in this record only reveals that some basis for making this assignment primarily to the Mail Handler craft can be found to be consistent with past practice. Affirmative evidence of a failure to abide by the guidelines provided by the criteria in the Memorandum or otherwise was not provided by the APWU.

Much testimony and observation time on the field visit was devoted to Platform Operation 210/239. The APWU protested the primary craft assignment of manual sorting of outside parcels to the Mail Handlers. Since Mail Handlers customarily are employed on the docks, it was efficient and more productive to integrate their assigned tasks by having them undertake the manual sorting of outside parcels accomplished in this work area. Such testimony as was offered on this point indicated that past practice would support the Mail Handlers' claim that non-scheme separation of sacks, parcels, and particularly outsize parcels on the platform has been regarded as Mail Handler assignments at many facilities.

President Andrews also objected to the assignment of any ledge loading and sweeping to Mail Handlers. Here again, the asterisk page 3 of the Regional Instruction would require that such assignments be made to the craft primarily responsible for and integrated with the distribution function. Where, as is most prevalent, distribution is performed by the Clerk craft, considerations of efficiency and economy as well as the rational integration of operations would dictate that ledge loading and sweeping be primarily assigned to the Clerk craft.

Another major controversy appears to concern the handling of non-machinable outsides. These are the packages which are too bulky or heavy or too awkward to be processed by machine. Such packages are distributed, at present, through Bulk Mail Centers.
The present method employed for their distribution does not require *** employ scheme knowledge. The testimony did indicate that such "parcels" are brought to the distribution point by Mail Handlers and they are physically taken away by Mail Handlers. Requiring the intervention of a Clerk to direct the flow of such

NMO's would interrupt the integration of such operations which may be achieved by having the same individuals handle the whole process of non-scheme NMO sortation. The directive contained in the Memorandum guidelines, to take into consideration efficiency and productivity, would be violated if the primary assignment of such operations required this function be performed by a member of the Clerk craft.

Some additional comments are necessary to support the conclusion that the findings made above, concerning the propriety of the primary assignments made in Regional Instruction No 399, are consistent with the conclusions reached by Arbitrator Garrett in Case No. AW-NAT-5753, introduced in evidence by the APWU. In that case, the Arbitrator found that certain work assignments were unilaterally transferred from the Clerk craft to the Mail Handlers. In this case, the testimony and other evidence in the record establishes that each of the disputed assignments were being performed by Mail Handlers as well as Clerks at various facilities throughout the Country. Additionally, as stated earlier, the assignments made in Regional Instruction No. 399 are "primary" assignments only. There is no entitlement bestowed upon either the Clerks nor the Mail Handlers to perform each of these operations at every facility. No employee presently performing any of the disputed operations of functions is to be replaced except by attrition. No hard and fast demarcations have been made. No wholesale dislocations or reassignments of functions or operations is contemplated.

It must also be noted that the Garrett Award did provide that changed conditions could bring about changes in assignments. As was discussed earlier in this Opinion, revolutionary changes in the process of mail handling have been experienced. Regional Instruction No. 399 has reacted to those changes on a national basis by a reevaluation of previous functional assignments in a very limited way. Craft lines have not been obliterated nor ignored. They have been recast in a formal writing to reflect changes in practice, which have evolved over the period of the past several years, which were responsive to the technological and other operational changes which have been instituted by management to move the mail more efficiently and effectively.

These dramatic changes in the way the mail is now moved and in the even more dramatically different way the mail will be distributed and transmitted in the future will certainly impact upon the work environment and job content of every postal employee. Although the APWU did assert that as a result of the implementation of Regional Instruction No. 399 the employment opportunities for members of the Clerk craft had been disproportionately been reduced, the evidence which the Union offered in support of such a claim was not fully persuasive. This record does not support a finding that over some period of time as a result of the implementation of Regional Instruction No. 399, coupled with further technological advances and operational changes which will be made, that employees possessing higher skills and qualifications will be less in demand. The contrary appears more likely.

For the reasons set forth above, the Undersigned must ultimately conclude that the publication and implementation of Regional Instruction No. 399 has not violated the cited provisions of the National Agreement, the Memorandum of Understanding on Jurisdiction appended thereto, or any of the other accepted criteria for jurisdictional determinations to which the APWU made reference.

THERFORE, after due deliberation, the Undersigned makes the following

## AWARD

The grievance presented by the APWU in Case No. AD-NAT-1311 must be and hereby is denied.

HOWARD G. GAMSER, ARBITRATOR

Washington, D.C.
October 13, ***