UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN POSTAL WORKERS UNION, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br> (RBW/ak) <br><br> NATIONAL POSTAL MAIL HANDLERS UNION, A DIVISION OF THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, <br><br> and <br><br> UNITED STATES POSTAL SERVICE, <br><br> Defendants. | Case No. 1:05-CV-01290 |

# Exhibit 12 to Hill Declaration

REGIONAL JURISDICTIONAL DISPUTE ARBITRATION
BEFORE
ARBITRATOR ERIC J. SCHMERTZ

| | |
|---|---|
| UNITED STATES POSTAL SERVICE ) | |
| ) | |
| AND ) | |
| ) | |
| AMERICAN POSTAL WORKERS UNION ) | In Re: Arbitrability |
| ) | |
| AND ) | |
| ) | |
| NATIONAL POSTAL MAIL HANDLERS ) | |

POST-HEARING BRIEF OF THE
NATIONAL POSTAL MAIL HANDLERS UNION

On the Brief:
Lawrence Hill
NY. State Executive Board Member
NPMHU, Local 300
452 Dawson Lane
Jericho, New York 11753
LHILL93601@aol.com

## INTRODUCTION

This post-hearing brief is filed on behalf of the National Postal Mail Handlers

Union ("NPMHU"), following the completion of Regional-level arbitration hearings

NPMHU-0084

arising under the tripartite Regional Instruction 399 Dispute Resolution Procedures

("Dispute Resolution Procedures"). See Joint Exh. The Dispute Resolution

Procedures are meant to resolve longstanding jurisdictional dispute amongst the

parties.

On the second hearing date on the instant cases, the Arbitrator posed some

pertinent questions that should be answered in order to render a proper and just

decision on the issue of arbitrability. Moreover, we believe that the timeliness

issue raised and argued by the USPS failed totally for want of merits because

every one of the USPS documents themselves demonstrated that the NPMHU

was never called untimely at any of the various mandatory steps of the Article 15

grievance procedure. The current USPS advocate in these instant dispute

resolution cases has no authority whatsoever to retroactively backtrack and deem

any aspect of these cases untimely at this stage. She could have only argued

timeliness now if an untimely call had been previously asserted at any of the

individual steps of the grievance procedure.1 Even her predecessor, the

vociferous USPS Labor Relations Specialist Doug Dawson, knew fully well the

contract language, and did not attempt to deem either grievance as untimely when

they were in the Article 15 grievance procedure. There simply was no basis to do

so. And she offered no evidence to prove such.

---

1 See pages 4-5 of the NPMHU opening brief on the instant cases.

<u>2</u>

The genesis of the cases involved <u>cross-craft</u> issues, <u>not</u> jurisdictional and that is at the core of the astute questions that the Arbitrator has posed before proceeding on these issues. The second major question posed was that of the issue of Doug Dawson's <u>referral</u> of the instant cases <u>from</u> the Article 15 grievance-arbitration procedure into the dispute resolution procedure. The Arbitrator will indeed recall that he asked the inexperienced USPS advocate at the hearing <u>if</u> <u>she were saying</u> that Mr. Dawson's <u>referral</u> of the two cross craft cases into the dispute resolution procedure just prior to hearing of the regular regional arbitration was improper.2 Indeed, the Arbitrator again repeated the identical question to her. Her answer was "I guess, I guess so. Yeah, I guess so." <u>Notably</u>, this answer is not without consequence. Although she was saying what she thought the Arbitrator wanted to hear in order to prove her case, her acquiescence to that argument thereby becomes detrimental to USPS/APWU argument on arbitrability. Moreover, the APWU argues identically with the USPS that Dawson was indeed incorrect when referring the cases from the Article 15 grievance procedure into the dispute resolution procedure. Mr. Arbitrator, that appears to be the unanimous consent of the parties. And since that is the case, the two instant cases were indeed properly before the scheduled Regular Regional paneled Arbitrator Sarah Cannon-Holden in the first place.

---

2 Recalling that both the APWU and the USPS argued against the "legality" of Dawson's referral.

3

It is apparent that the parties agree that Doug Dawson's February, 1999 referral was improper. Both APWU and the USPS state there is nothing in the RI-399 procedures that permits Dawson to refer Article 7.2 (cross craft) grievances from the Article 15 grievance-arbitration procedure into the Dispute Resolution Procedure.

Notwithstanding the above, the NPMHU will discuss the pertinent questions posed by the Arbitrator so that a proper decision may be rendered. And with that, it would be clearly necessary to properly discuss the differences between **cross craft** and **jurisdiction**. At the end of that discussion, the Arbitrator will clearly see that the APWU assertion in the fourth paragraph of their opening statement is indeed ludicrous regarding this subject.

## CROSS CRAFT VERSUS JURISDICTION

When the NPMHU trains it's shop stewards, one of the most basic concepts taught to them is the difference between cross craft cases and jurisdictional cases. They are definitely not one-and-the-same. In the United States Postal Service, as in many other companies that are labor intensive in accomplishing their missions, certain jobs, duties and positions fall under the aegis of an occupational group or what we call craft group. Basically, as we described in our opening brief, the job assignments are usually found in most mail plants where the vast majority of mail processing takes place, specialized to a certain degree not only for the benefit of

4

NPMHU-0087

the employer, but also for the affected employees and their labor unions. In the USPS, the Implementation Criteria of Regional Instruction 399 are generally used to determine most mail processing jobs (work assignments).3 As part and parcel of the RI-399 document, the **Mail Processing Work Assignment Guidelines** follow three pages later circa page 160.4 These Mail Processing Work Assignment Guidelines represent the USPS national assignment of mail processing work assignments and individual functions within various operations found on the work floor in mail plants. The operation numbers represent postal accounting designations recorded in it's time and attendance systems which are meant to properly provide it's management with statistical information about work hours and amount of work performed, inter alia. The Mail Processing Work Assignment Guidelines do basically lay out what the USPS at the national level expects it's field mail processing and distribution operations to comply with regarding assignment of each individual craft to work.

Almost invariably, when the work **functions** in each operation are designated to one craft or another in the Mail Processing Work Assignment Guidelines, the managers in the field will comply with them. When one labor craft is designated as the **primary craft** for the performance of that work, then they are

---

3 See NPMHU-USPS National Agreement, Letter of Intent, Regional Instruction 399, p. 157 or the Joint Exhibit, LOI, RI-399 signed 2/16/79.

4 The latest revision of the Mail Processing Work Assignment Guidelines were established on 11/15/87.

said to have **jurisdiction** of that work. The Mail Processing Work Assignment

Guidelines contain approximately **19** pages of detailed information listing the

operation and operation number, individually numbered functions normally

performed in that operation and the designation of which craft is considered

primary or who has jurisdiction of individual functions of that work. You will note

that in every **operation** contained in the Mail Processing Work Assignment

Guidelines, **all 19 pages**, there is not a single **function** that is permitted to be

shared between the crafts.5

    Once a craft is designated the primary craft for the performance of individual

**functions** of work in the variously described operations listed in the Mail

Processing Work Assignment Guidelines, they are generally expected to be the

only craft assigned to perform that work in any postal installation. When the USPS

has assigned those work functions to the primary craft, that craft has **jurisdiction**.

From that point onward, any management mis-assignment of any other

employees from another craft into that work **function** thereinafter is deemed a

**cross craft assignment** and will normally cause the USPS to suffer some type of

---

5 The only individual function of any nationally assigned work
operation that we know of that is permitted to be a mixed individual
work function is on the sweeping duties of the SPBS wherein the
Clerk craft is permitted to sweep for brief 15 minute intervals to rest
their eyes from keying. Ergonomic respites do not constitute any
legitimate claim to primary craft designation as you well know.

NPMHU-0089

liability or other remedial action for this violation.6 Just as a cautionary note, one must be careful **not to confuse** a mixed operation with a mixed function. Most operations in mail processing and distribution necessitate a mix of Clerks and Mail Handlers performing their own specialized individually assigned functions within that operation as is clearly demonstrated in the Mail Processing Work Assignment Guidelines. In other words, the advent of specialization and primary craft jurisdiction dictates that those individual functions listed in each operation must be performed solely by one craft with virtually no exceptions.7 The three parties at the national level agree that **mixed operations** are often necessary, but that **mixed functions** are strictly "taboo." Indeed, when there is a dispute amongst the parties as to who is to be assigned jurisdiction of duties in an individual function, the dispute resolution procedure is designed to solve that issue. In fact, that is the reason for it's being, i.e., the proper assignment of the duties described in a function of an operation.

When either craft has (primary craft) jurisdiction of work in the individual functions of an operation, that craft which has the jurisdiction is thereby entitled to file cross craft grievances challenging these incursions of ad hoc assignments of

---

6 Postal arbitrators have for decades provided variable remedies for cross craft violations. In some cases, they render cease and desist orders, payment of foregone overtime to the affected craft, hiring of new craft employees to cover the work and other remedial action.
7 The sole exception known to the NPMHU which permits an ad hoc mixed function is the sweep function on the SPBS machine, but for limited time for ergonomic reasons.

7

other crafts into the duties for which it has jurisdiction. Local field management is sometimes not adept at complying with what national postal headquarters has mandated as far as assignments go. Cross-craft grievances are usually filed under auspices of Article 7.2, inter alia, of the National Agreement. Where one craft maintains jurisdiction of the designated work described in the functions column of the Mail Processing Work Assignment Guidelines, there is no need to send the grievance to the Dispute Resolution procedure. It is just a cross craft grievance which follows it's normal course in the Article 15 grievance procedure up to and including arbitration.

You will recall the most ludicrous assertion made by the APWU in paragraph 4 of their opening statement wherein they state, "This memorandum required both the Mail handlers and the APWU to cease filing grievances over work assignments (crossing crafts)." **Nothing could be farther from the truth**. The APWU didn't even cite **where** in the Memorandum that this false concept is alleged to have been cited from. They obviously believe that they can run one by an arbitrator who is new to the panel. The whole reason for the dispute resolution procedure in the first place is to properly assign the right craft to the right functions of an operation if there is a dispute. Once that formal assignment was made, the craft with jurisdiction may file cross craft cases.

This takes us to how you can tell who has primary craft jurisdiction. There are <u>at least</u> four ways to tell if a craft has jurisdiction of a work function. The most

<u>8</u>

common way is that the craft has preferred duty assignments or "job bids" which are written assignments of craft workers who bid by seniority for work assignments in sections, by hours of work, days or rest, shifts, and type of work. The second way to tell is if the installation inventory is signed off on by all three parties. Another way is that if a craft has statutorily and nationally recognized "key/standard position "status."8 Generally these nationally assigned positions are not supposed to be up for grabs as the USPS-APWU in Brooklyn would have you believe. And still another way to tell who has jurisdiction is by just consulting with the Mail Processing Work Assignment Guidelines, those 19 pages which basically spell out who has jurisdiction. In summary, for purposes of our discussion here, the jurisdictional assignments are identifiable by one or more of the following;

(a) **Preferred duty assignments** (job bids)
(b) Installation's **facility inventory** signed off on a tripartite basis
(c) Possession of statutorily and nationally recognized "**key positions** and "**standard positions.**"
(d) Possession of assignments under of the **Mail Processing Work Assignment Guidelines of RI-399.**

There are of course others and some possible exceptions, but for our purposes here, there is no need to confuse the issue.

Just over the past 4-5 years, the NPMHU has won at least 30-34 cross craft grievance cases in the New York Metro area alone before postal arbitrators who are extremely well versed in contract interpretation and who <u>would not</u> have

---

8 Key/standard position status connotes core work assignments that are established nationally. Some examples of key/standard position

sustained those grievances had the NPMHU not had jurisdiction of the work. Clearly, APWU's argument in paragraph four of their opening statement is <u>totally</u> misplaced, untruthful and nonsensical.

Not only is the dispute resolution procedure responsible for ultimately facilitating the proper assignment of primary craft JURISDICTION of work functions, but it also facilitates the filing of subsequent cross craft grievance cases. When either of the parties can demonstrate that it has jurisdiction by virtue of possession of the requisite requirements cited in (a-d) above, then it is entitled to proceed with cross craft grievance cases in the regular regional arbitration procedure.

Often, with regards to cross craft cases, USPS Labor Relations Specialists smell a loss or look to cut their liability or just look to hide the case under the carpet for a few years and in an act of desperation improperly refer the cases into the dispute resolution procedure. Indeed, NPMHU's Local 300 President Paul Hogrogian, representing Mail Handlers within the confines of the USPS New York Metro Area has been at serious odds with the USPS, especially when Labor Relations Specialists improperly refer cross craft grievances into the dispute resolution procedure in order to "sweep them under the rug" for years. This deprives the NPMHU of the right to file legitimate cross craft cases. And as in the instant cases before you, the lengthy cross craft assignments make the clerks

---

jobs are "Clerk," "Mail Handle," "Custodian," "Motor Vehicle.

10

think that they own the work, when in reality, nothing could be further from the truth.

## THE QUESTION OF THE USPS REFERRAL OF THE NPMHU CROSS CRAFT CASES INTO THE DISPUTE RESOLUTION PROCEDURE

Notwithstanding the above discussion, the Arbitrator has astutely raised another question concerning the legality of USPS Labor Relations Specialist Doug Dawson's referral of the NPMHU cross-craft grievance from the Article 15 grievance procedure into the Dispute Resolution Procedure. Approximately one month before Arbitrator Sarah Cannon-Holden was scheduled to hear the cross-craft case at regular regional arbitration on March 2, 1999, Dawson, in February referred the two cases into the dispute resolution procedure. **See NPMHU Exhibit G-1**. Dawson had apparently been apprised of the **Q&A – RI-399 Dispute Resolution** document which reads in pertinent part.

> **"3. If a grievance exists or is filed alleging a violation of the contract other than RI-399 (e.g. Article 7.2){cross crafts} and one of the parties believes the issue in the grievance constitutes a jurisdictional dispute, what if anything should be done with the grievance?"**
> **"Answer: It must be referred to the Dispute Resolution Procedure Committee for an initial determination as to whether or not it involves a jurisdictional claim. If it is determined it involves a jurisdictional claim, the grievance will be processed in the Dispute Resolution Procedures. If the Committee is in disagreement as to whether or not the grievance involves a jurisdictional claim, that question is appealable through the Dispute Resolution Procedures up to and including arbitration for resolution prior to the parties addressing the merits of the dispute. The three parties shall review cases at the lowest possible level which raise**

Operator," "Letter Carrier," "Copy/Duplicating," and "Label Makers."

11

**the _potential_ of containing a jurisdictional dispute so that the proper procedure is utilized to resolve disputes/grievances."**

This document was signed off on a tripartite basis on 10/21/92, fully six months after the original national MOU on Dispute Resolution was signed. Dawson referred the instant cases to the RDRC at the time that he made his referral. It was not until December of 2004 when the RDRC referred the cases back to the LDRC at the insistence of NPMHU NY State Rep., Larry Hill. See NPMHU Exhibit H-2. It is obvious that the parties made separate arguments because the RDRC apparently did not specify any clarification that it needed and did not make a referral back to either the grievance procedure or to the grievance procedure.

In addition to the Dawson referral in 1999 under the aegis of the Q&A RI-399 DRP's, the parties once again changed or augmented it's position at the national level on a tripartite basis. The following settlement agreement from the parties' Joint Exhibits on the issue of item number (3), Non-jurisdictional cases follows the USPS' Dawson referral in NPMHU Exhibit G-1 by approximately 18 months.

**"SETTLEMENT AGREEMENT**
**Re: Operations 110-129 and 180-1 89; Dock Connection Transfers; and NonJurisdictional Cases**
As clarification to existing Memoranda of Understanding, Letters of Intent, and previous correspondence, the parties agree to the following:
**1. Ooerations 110-129 and 180-189**
Craft assignments in Operations 110-129 and 180-189 may be made by management based on the primary purpose of the operation. The parties recognize that there may be disagreements among the parties regarding what the primary purpose of any particular operation _is_ and reserve the right to make such arguments in individual cases.
If an opening unit described in Operations 110-129 and 180-189, which normally is located inside a facility, is instead located on a platform, the RI-399 guidelines for Operations 1 10-129 and 180-1 89 still govern. If a platform operation described in Operations 210-239, which normally is located on a platform, is instead located inside a facility, the RI-399 guidelines for Operation 210-239 still govern.

**12**

In accordance with the Memorandum of Understanding (Re: Dispute Resolution Procedures), dated April 1992, "[m]anagement will not engage in operational changes for the purpose of affecting jurisdictional assignments in a facility." A change in the operation number alone, without any change in the way the operation is performed, is not considered an operational change for the purposes *of* that Memorandum of Understanding.

**2. Dock Connection Transfers**

For the purposes of applying item 12 of Operations 210-239, the term "making dock connection transfers" means performing the duties of verification, oversight, and record keeping associated with assuring that the proper connections and transfers are made.

**3. Non-jurisdictional Cases**

The parties agree that those grievances not dealing with jurisdictional issues shall not be referred to the RI-399 Dispute Resolution Procedures and, if such cases already have been referred, shall be removed from the RI-399 Dispute Resolution Procedures for further processing under the terms of Article 15 of the appropriate National Agreement. Regional and Local Dispute Resolution Committees are responsible for identifying such grievances.

For these purposes, non-jurisdictional cases are those cases in which the underlying craft jurisdiction is not under challenge. These cases are cases where there exists an inventory that has been properly completed and signed by representatives of all three parties; cases where there was no dispute pending as of April 29, 1992, and there has been no claim of New or Consolidated Facilities, New Work, or Operational Change since that date; and cases where the remedy sought by the grieving union does not include permanent reassignment of the work to a different craft. The mere citation of, or reference to, RI-399 either in a union's grievance or in a management response to a grievance does not mean that the case involves a jurisdictional dispute; rather, the parties must examine each case to determine whether it involves a jurisdictional dispute that must be resolved under RI-399 or whether it is a non-jurisdictional case that should be resolved under Article 15 of the appropriate National Agreement.

The parties agree that an arbitrator hearing a non-jurisdictional case under the Article 15 procedures is not empowered to decide jurisdiction; that no party will seek a determination from the arbitrator on jurisdiction; and that any portion of the arbitrator's award which may include a decision on jurisdiction will be disregarded and will not be implemented.

**4. Scope of the Settlement**

Pursuant to the Memorandum of Understanding (dated April 16, 1992, but effective on April 29, 1992) "no new disputes will be initiated at the local level by either union challenging jurisdictional work assignments in any operations as they currently exist. Except as otherwise specifically provided in New or Consolidated Facilities, New Work, or Operational Change sections contained in this memorandum, all local craft jurisdictional assignments which are not already the subject of a pending locally initiated grievance will be deemed as a proper assignment for that facility."

Accordingly, the principles set forth in this Settlement Agreement will be applied only to any properly filed pending disputes involving those operations. No craft changes will be made based on this agreement in facilities in which no properly filed dispute is pending.

This agreement constitutes full and final settlement of the following national cases and all cases held pending the resolution of these national cases:

1. Q90M-4Q-J 95001 820 Primary purpose
2. H7C-4R-C 13088 Dock connection transfers.

All open grievances and disputes involving these two issues will be promptly resolved or otherwise processed in accordance with the principles contained herein. All grievances held at the national level involving these two issues will be promptly remanded to the Regional Dispute Resolution Committee for prompt resolution in accordance with the principles contained herein.

Moe Biller  s/
President

American Postal Workers Union, AFL-CIO ,

William H. Quinn  s/

NPMHU-0096

13

President, National Postal Mail Handlers Union, AFL-CIO

Anthony Vegliante  s/
Vice President, Labor Relations
U.S.Postal Service

Here, in the yellow highlighted portions cited, the parties at the national level on a tripartite basis, fully 18 months after Doug Dawson referred the grievances in to the RDRC, have expanded and augmented the meaning to include the parties desire to have all functions now (Aug. 3, 2000) placed into an inventory to show jurisdiction.

Now, at this time it is clear that for cross-craft cases, as are the instant cases, which meet all the criteria, the sole function of the parties is to determine if the case is "(1) a jurisdictional dispute that must be resolved under RI-399" or (2) whether it is a non-jurisdictional case that must be resolved under Article 15 of the appropriate National Agreement.

This language therefore affirms that both parties have the opportunity to file cross-craft cases in the grievance procedure. However, it does also appear to want the parties to secure inventories to show jurisdiction. The question for the instant Arbitrator is thereby what is highlighted in yellow above. A decision must be made to either refer the cases back into the Article 15 grievance procedure, or to render it a jurisdictional case that must be resolved under RI-399, in which case it must go to the merits of the case and the Arbitrator must decide jurisdiction. A

14

key question here is whether the Arbitrator is bound to advance the cases on to the merits or return the cases back to the grievance procedure given the old Q&A – RI-399 language which did not contemplate a tripartite signed inventory. The new language appears on August 3, 2000.

The language is now clear that the parties have a choice. Advance the cases to RI-399 on the merits or refer it back to the status quo ante of the Article 15 grievance procedure for resolution. Mr. Arbitrator, the USPS and the APWU are parties to both the Q&A of RI-399 as well as the above cited August 3rd Settlement Agreement. Although it appears that that is well settle and mandatory that the parties proceed to the merits, we cannot forget that the both the APWU and the USPS at the second hearing on this matter repudiated the USPS Dawson referral into the Dispute Resolution Procedure. By doing so, they thereby knowingly repudiate both the **Q&A of RI-399** as well as the **August 3, 2003**, **Settlement Agreement**. Mr. Arbitrator, this repudiation would normally mandate that you restore the status quo ante by referring the cases back into the Article 15 grievance procedure. Frankly, Mr. Arbitrator, the NPMHU is prepared to either go into the grievance procedure or on to the merits before you in the RI-399 Dispute Resolution Procedure. We also offer the additional remedy of referring the case to the National DRC if you have any doubt whatsoever, contingent of course, upon returning the case to you if they were to decide that we should proceed to the merits of the case in the dispute resolution procedure. We also ask that you

review in your study time, the evidence and argument submitted in the opening brief of the NPMHU as well as the pertinent arbitration submission submitted in the appendixes of that brief. Although the NPMHU believes that we have answered your pertinent questions from the hearing, we have provided a menu of at least three remedies which we feel are most appropriate to the answers to your questions. In summary, we believe that you should either restore the status quo ante and refer the cases back to the grievance procedure since APWU and NPMHU repudiate Dawson's referral, or proceed on to the merits, or refer the issues to the National DRC or whatever appropriate remedy you deem appropriate.

Respectfully submitted;

Lawrence Hill
NY State Exec. Bd. Mbr.
NPMHU, Local 300